Plaintiff Donald Pet appeals the final decision of the defendant Connecticut Medical Examining Board (Board) suspending the plaintiff's license to practice medicine for five years and placing him on probationary status for an indefinite time thereafter. The Connecticut Department of Health Services (Department) is also named as a defendant. The Board acted pursuant to General Statutes 20-13c. This appeal is brought pursuant to General Statutes 4-183. The court finds in favor of the plaintiff and remands the case for further proceedings.
Pursuant to General Statutes 19-9 and 19a-14, the Department brought charges before the Board which, after several revisions, alleged eighteen counts of violations of General Statutes20-13c by the plaintiff. The allegations concerned the psychiatric care and treatment that the plaintiff provided to four (4) female patients. In particular, the Department charged that the plaintiff improperly employed and supervised the work of these women in his clinic while also acting as their therapist; that he engaged in sexual relations with these patients; that he mismanaged the "transference phenomenon"; and that he improperly prescribed medication and failed to monitor the use of the medication.
PROCEDURAL HISTORY
The case presents a tortuous and, in some respects, troubling procedural history, and this provides the basis for some of the plaintiff's claims. The plaintiff was served with a notice of hearing and statement of charges on April 19, 1986. On May 6, 1986, the plaintiff filed a motion for disclosure and production, motion for hearing by the entire board; a motion for issuance of a subpoena duces tecum; a motion for a more specific statement; and a motion for a continuance. The Board granted a continuance until June 24, 1986 and granted, in part, the motion for a more specific statement. The remaining motions were denied. An amended statement of charges was issued on June 9, 1986.
Subsequently, the Board denied a motion to dismiss dated June 12, 1986, but ordered the Department to file a second amended complaint deleting certain language objected to in the motion to dismiss. The plaintiff also filed a motion for sequestration of witnesses and a motion for continuous hearings and retention of the CT Page 5695 same panel members to hear the proceedings to conclusion. These two motions were also denied.
The hearing commenced on June 24, 1986, before a designated panel consisting of Board members. A second hearing date was scheduled for August 19, 1986, but was postponed at the plaintiff's request. It was eventually held on November 4, 1986. Two additional hearing dates were scheduled for December 2 and December 16, 1986, but these were also continued at the request of the plaintiff.
In the meantime, the plaintiff instituted an action for a temporary injunction and order to show cause on November 13, 1986. The defendants filed a motion to dismiss on December 4, 1986, claiming that plaintiff had failed to exhaust his administrative remedies. The court, O'Neill, J., denied this motion on January 15, 1987. Plaintiff also filed an amended complaint on December 11, 1986, adding a second count based on 42 U.S.C. § 1983. The plaintiff's action seeking injunctive relief was heard on January 28, 1987. The trial court, Spada, J., rendered judgment in favor of the plaintiff and ordered the Board to conduct the hearing in accordance with specific procedural requirements.
The defendants appealed the decision, and the Supreme Court transferred the case to itself. In its decision released May 10, 1988, the Supreme Court held that the plaintiff had failed to exhaust his administrative remedies and remanded the case with instructions to dismiss it for lack of jurisdiction. Pet v. Department of Health Services, 207 Conn. 346 (1988).
On April 28, 1987, while the Supreme Court appeal was pending, the hearing before the Board was reconvened to discuss motions made by both parties. The Department's motion for supervision of practice was denied. Arguments concerning the plaintiff's interrogatories and request for production and the Department's objections thereto were heard on April 28, 1987. The Board overruled in part and sustained in part the Department's objections to interrogatories and its objections to requests for production.
The evidentiary hearing before the panel designated by the Board resumed after the Supreme Court decision and was held on seventeen dates beginning on August 9, 1988 and ending on August 29, 1989. From August 9, 1988 on, plaintiff appeared pro se. In addition to hearing testimony and receiving evidence, the panel eliminated certain charges included in the original complaint.
On or about October 6, 1989, the Department submitted to the panel a recommended "Proposal for Decision." The panel issued its formal "Proposal for Decision," pursuant to General Statutes CT Page 56964-179, on February 26, 1991. The letter transmitting the panel's proposal for decision indicates that the Board was to meet on March 19, 1991, at which time the parties would be allowed to present a fifteen-minute oral argument before the Board, and also indicates that briefs were to be filed by March 12, 1991. In March 1991, the plaintiff submitted a brief responding to the Department's proposal for decision and the panel's proposal for decision.
At the March 19, 1991 meeting of the Board, the parties delivered oral argument; the Board questioned Dr. Shirley Williams, the only panel member remaining on the Board, about the case; voted to table a decision until the next month; and requested the Department to file a response to the plaintiff's brief by April 2, 1991. Following this meeting, the plaintiff submitted a letter taking exception to the Board's decision at the March 19, 1991 meeting to ask the Department, in the plaintiff's words, "to provide an objective review of [his] Brief, and to provide documentation of errors before the Board." (Emphasis in original.) The plaintiff attached to this letter a document entitled "Specific Errors," addressing claimed errors made by the Department and the Board. The record also contains written comments from the plaintiff addressing the Department's response to the plaintiff's brief concerning the Board's proposal for decision. This document bears a preparation date of April 15, 1991.
The second meeting at which the Board addressed the plaintiff's case occurred on April 16, 1991. The Board voted to strike from the statement of charges paragraph 3a of the Eighteenth Count; to amend the proposal for decision to impose a five-year suspension of the plaintiff's license after which the plaintiff's practice is to be restricted to group therapy within an institutional setting, supervised by a senior clinician approved by the Board. The final decision, incorporating those changes, was signed April 23, 1991, and mailed to plaintiff on April 25, 1991.
In its final decision, the Board found that the allegations concerning the plaintiff's employment of patients to work in his clinic did not constitute a violation of General Statutes 20-13c. However, the Board found that the plaintiff mismanaged the "transference phenomenon" in violation of 20-13c(4) as alleged in the Second, Seventh, Ninth and Thirteenth Counts; had sexual contact with the complainants in violation of 20-13c(4) as alleged in the Third, Eighth, Tenth and Fourteenth Counts; conducted activities described as a sexological examination under inappropriate circumstances in violation of 20-13c(4) as alleged in the Eleventh and Twelfth Counts; and improperly prescribed medication in violation of 20-13c(4) and (5) as alleged in paragraphs 3b and c of the Eighteenth Count.
By letter dated May 7, 1991, the plaintiff requested reconsideration. CT Page 5697 He also submitted a "`Correct' Final Decision," dated May 9, 1991 and a document entitled "Trial by Error," dated May 7, 1991. The third and final meeting of the Board with regard to this case was held on May 21, 1991, at which time the Board denied plaintiff's request for reconsideration.
AGGRIEVEMENT
Since the decision of the Board suspended the plaintiff's license to practice medicine, a significant personal and legal interest, the court finds that the plaintiff is aggrieved within the meaning of General Statutes 4-183 and has standing to bring this appeal.
PLAINTIFF'S CLAIMS
In his brief, the plaintiff advances numerous claims of error as the bases of his appeal. Some of these overlap or are closely related, and the court has distilled his arguments to the following:
1. The plaintiff was denied due process of law.
2. The Board improperly increased the penalty recommended by the panel.
 3. The Board held the plaintiff accountable to the wrong standard of care.
 4. There was insufficient evidence to support the Board's findings and conclusions.
Most of the plaintiff's claims may be dismissed summarily in accordance with well-known principles of administrative law. The court will consider first Nos. 2, 3 and 4, as enumerated above.
With respect to the five-year suspension of Dr. Pet's medical license, which was imposed by the Board, the court notes that the maximum penalty permitted by the applicable statute, General Statutes 20-13c, is permanent revocation of the license. Since the lesser penalty of suspension is well within the permissible range, the court cannot alter the exercise of the Board's discretion in that regard unless there was an abuse of that discretion. Gibson v. Connecticut Medical Examining Board, 141 Conn. 231 (1954). Under the circumstances of this case, including the factual findings made by the Board, the court cannot conclude that the Board abused its discretion in imposing the penalty that it chose. The plaintiff's contention on that issue alone, therefore, will not support a reversal of the Board's decision. Following a new hearing of course, if the Board again finds the plaintiff culpable, it may determine that the same or a different penalty is warranted. CT Page 5698
The plaintiff's claims with respect to the standard of professional care that the Board considered and the sufficiency of the evidence on which it based its findings and conclusions are like wise governed by longstanding principles of law. Under statute and case law, the court's scope of review of administrative decisions is very limited. General Statutes 4-183 provides that "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." See, also, Feinson v. Conservation Commission, 180 Conn. 421, 425 (1980), and numerous cases cited therein, holding that "[t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency." Furthermore, "[t]he court can do no more, on the factual questions presented, than to examine the record to determine whether the ultimate findings were supported, as the statute requires, by substantial evidence." Persico v. Maher, 191 Conn. 384, 409 (1983).
"Judicial review of conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion." CLP v. DPUC, 219 Conn. 51, 57-58 (1991). Similarly, "it is the court's practice to accord great deference to the construction given a statute by the agency charged with its construction" Griffin Hospital v. Commission on Hospitals Health Care, 200 Conn. 489
(1986).
The court has examined the voluminous record in this case and finds that there is substantial evidence in that record to support the Board's findings and conclusions. Therefore, the court cannot disturb those findings and conclusions even though the record contains conflicting evidence presented by the plaintiff. With respect to the plaintiff's claims concerning the proper standard of professional care, the court notes that the Board's decision was based on its interpretation of General Statutes 20-13c(2), 20-13c(4), and 20-13c(5). These provisions form the proper basis for the Board's action, and there was, accordingly, no abuse of discretion in that regard.
Again, in so holding, the court considers these claims independent of the plaintiff's due process claims. Following the required new hearing, the Board will necessarily make new findings and conclusions based on the evidence presented at the new hearing.
DUE PROCESS CLAIMS
In his general argument that he was denied due process of law, the plaintiff cites numerous claims of improper procedure and denial of rights. The court agrees with the plaintiff that the Board CT Page 5699 improperly curtailed his right to cross-examine an adverse witness and thereby denied him due process. Before discussing that issue, however, the court will address his other claims of denial of due process.
1. Inappropriate Forum. The plaintiff claims he was denied due process because the case was too complex, involving many technical issues, numerous witnesses, and an extended evidentiary hearing, to be decided by a board composed only of volunteers who were not willing or able to devote the time necessary to address properly all aspects of the case. He further argues that there was an unreasonable discontinuity in the scheduling of the evidentiary hearings, which took place over a five-year period. In essence, the plaintiff attacks the entire administrative procedure by which complaints involving licensed medical doctors are heard and resolved. The court agrees with the plaintiff that the procedure, at least in this case, was too cumbersome, too protracted, and too unfocused to provide the best forum for adjudicating an issue as vitally important as the preservation of his license to practice medicine. Nevertheless, the composition of the hearing panel and the overall procedure which the Board followed conformed to the applicable statutes and regulations. Furthermore, our Supreme Court in Pet v. Department of Health Services, supra, 362-366, held that the failure to provide a continuous hearing does not per se constitute a denial of due process. Finally, the court notes that the most significant interruptions in the hearing schedule were caused by the plaintiff himself. In particular, his unsuccessful action for injunctive relief consumed nearly one and one-half years.
For all of the above reasons, the court concludes that the plaintiff's arguments that he was denied due process because of the nature of the administrative procedure cannot be sustained. It may well be that the procedure could be considerably improved by the utilization of professional, full time adjudicators and other innovations, but those are questions for the legislature to address, not this court.
2. Adjudicators Unfamiliar With Case. The plaintiff claims that only one of the members of the Board who eventually voted to issue the final decision had participated in the evidentiary hearings. He argues that the Board was therefore incapable of fairly deciding factual issues where the credibility of witnesses was crucial. Again, the court agrees that the applicable statutes and regulations resulted in a procedure in this case that was not well suited for dealing with many of the issues to be resolved. The procedure the Board followed, however, did conform to those rules, most particularly General Statutes 4-179. The court cannot, therefore, conclude that the plaintiff was denied due process of law in that regard. See Pet v. Department of Health Services, CT Page 5700 supra 356-357, 362.
3. Lack of Counsel. The plaintiff claims that he was denied due process because he was unable to retain counsel to represent him over the protracted period of time that the case consumed. There is, however, no constitutional or statutory requirement that a person be provided counsel in an administrative proceeding of this kind. His argument in that regard may not be sustained.
4. Denial of Discovery. The plaintiff claims that he was denied due process because the Board did not grant his discovery requests. In his brief, the plaintiff specifies the information he was denied as being "the complainants' treatment by other therapists" and, with respect to the only expert witness, "the area of expertise of the witness" and "what issue he/she will be testifying." The general rule is that discovery is not required in administrative proceedings to the same degree as in other civil actions. Pet v. Department of Health Services, supra. More importantly, the record in this case does not support the plaintiff's contention that he was unable to obtain the information he sought. The records of three doctors who treated one of the complainants were produced by subpoena and released to the plaintiff with the consent of the complainant. Dr. Donald Grayson, who treated another of the complainants, testified at the hearing and produced all of his records. Dr. Alfred Herzog, who treated another complainant, did likewise. With respect to the expert witness, Dr. Kenneth Selig, the Department furnished the plaintiff with a copy of the witness's curriculum vitae at the beginning of his testimony, and the plaintiff indicated he had no objection.
Based on the foregoing facts as appearing in the record and the general rules of administrative procedure, the court concludes that the Board did not deny the plaintiff due process of law by its rulings on discovery.
5. Bias of the Board. The plaintiff argues that he was denied due process because the Board was not impartial and was biased in favor of the Department. Specifically, the plaintiff claims that the attorneys for the Department and the Board are too closely related; that the attorney for the Department was allowed to submit a proposal for decision to the panel; and that the plaintiff was denied an opportunity to present oral argument on his motion for reconsideration, whereas the Department was allowed to speak against it. While these claims at first raise serious questions about the Board's neutrality, a review of the actual events as appearing in the record does not support a conclusion of bias on the part of the Board.
The record shows that the Board rejected fifty-two findings urged by the Department in its "proposal for decision." The CT Page 5701 Board dismissed the Department's charges in counts 15 through 17 and 18, paragraphs 3a and 3d, prior to issuing its decision. It also found the plaintiff not guilty of the Department's charges set forth in counts 1 and 4 through 6. The Board rejected the Department's request that the plaintiff's license be revoked and ordered a five-year suspension instead. Additionally, the Board rejected a Department witness offered as an expert in psychotherapy cults.
The plaintiff repeatedly argues that the Department was allowed to submit a reply to the plaintiff's response to the panel's proposal for decision. He apparently claims that the Board improperly asked the Department to provide "objective review" of his brief and that once the Department was allowed to submit its document, the plaintiff should have been allowed to reply to it. The major flaw in this argument is that the document submitted by the Department to the Board was not offered as an "objective review" to assist the Board, and the text of that document in no way indicates that it was intended as such. It is clearly in the nature of a reply brief; that is, an argumentative response to the plaintiff's brief. See Record, Vol. xxxi, pp. 288-300. The plaintiff's contention that the Board was improperly looking to the Department for objective, professional guidance is plainly based on a misinterpretation of the facts. Furthermore, the plaintiff's complaint that he was denied the opportunity to present his arguments to the Board is without foundation. The record shows that he took advantage of multiple opportunities to do so. See inter alia, Record, Vol. XXXI, pp. 240-263, 301-379, 500-523.
As to the plaintiff's request for reconsideration, the Uniform Administrative Procedure Act in effect when the agency proceedings commenced in this case, and thus governing the applicable procedure, does not contain any provision permitting a request for reconsideration. General Statutes (Rev'd to 1985) 4-166
et seq.; General Statutes (Rev'd to 1991) 4-185; Vernon Village Inc. v. Carothers, 217 Conn. 130, 140 (1991). More specifically, there was no requirement in the applicable law that oral argument be allowed on a request for reconsideration. Indeed, the Board was not required to entertain the request at all. General Statutes 4-181a, cited by the plaintiff, is not applicable because it did not become effective until July 1, 1989, well after these agency proceedings commenced. Nevertheless, the plaintiff was allowed to submit lengthy written argument in support of his request for reconsideration.
"It is presumed that members of administrative boards acting in an adjudicative capacity are unbiased." Jutkowitz v. Department of Health Services, 220 Conn. 86, 100 (citations omitted). "The party who contends that an adjudicator is biased bears the burden of proving the disqualifying interest.' Id. (citations omitted). In this case, the plaintiff has not met that burden of proof. CT Page 5702
6. Record Inadequate. The plaintiff claims he was denied due process of law because the post-hearing meetings of the Board, at which the parties presented oral argument and the Board members discussed the case, were not recorded and transcribed. Minutes of those meetings, however, are contained in the record. It seems preferable to record and transcribe all of the board proceedings which involve a contested case. However, the plaintiff points to no legal authority to support his contention that the failure to record those proceedings and, instead, provide only minutes, amounts to a denial of due process. To the contrary, the defendants cite Elmcrest Manor Psychiatric Institute, et al v. Connecticut Commission on Hospitals and Health Care, et al. No. 4185 (Superior Court, Middlesex J.D., December 14, 1984, Dorsey, J.), holding that verbatim recording of post-hearing meetings is not required by law. The court concludes that the plaintiff has not sustained his burden of showing denial of his due process rights in this regard.
7. Patient/Employee Relationship. The plaintiff claims he was denied due process because the Board restricted his right to present evidence concerning charges that he improperly acted as both therapist and employer of several individuals. However, the Board dismissed some of these charges and found the plaintiff not guilty of the others. Accordingly, his due process claims concerning them are moot.
8. Limitation on Oral Argument. The plaintiff claims he was denied due process because the Board limited him to fifteen minutes of oral argument. This claim, as set forth in the plaintiff's brief on appeal to this court, might have merit in another case. However, in this case the record shows that the plaintiff was given ample opportunity to convey to the Board his arguments concerning the proposed decision, pursuant to General Statutes4-179. In particular, he filed a sixty-two-page brief and followed that with another lengthy memorandum. While it would have been preferable to afford more time for oral argument, the Board's ruling in this case did not constitute denial of due process.
LIMITATION ON CROSS EXAMINATION
At the administrative hearing held on April 18, 1989, the Department presented as its expert witness, Dr. Kenneth Selig, a psychiatrist and a graduate of Yale Law School. During its direct examination, the Department elicited from Dr. Selig his professional opinion on most of the charges it had brought against the plaintiff.
Generally speaking, Dr. Selig's testimony on direct examination supported the positions taken by the Department. Thus, Dr. CT Page 5703 Selig testified about the Department's charges that the plaintiff violated General Statutes 20-13c in connection with his employment of patients, his management of the "transference phenomenon," his alleged sexual contact with patients, his conduct of a "sexological examination" of a patient, and his prescription and monitoring of medication for his patients. See Record, Vol. XIV. The direct examination consumed most of the morning of April 18, 1989.
Before noon on April 18, the plaintiff began his cross examination of Dr. Selig. The hearing was adjourned that day at 12:20 p.m. The cross examination continued at the next session, one week later on April 25.
Analysis of the record of the cross examination reveals that it covered all of the topics which were the subject of the direct examination. Additionally, the plaintiff pursued many questions aimed at weakening the witness's credibility, especially in the area of the witness's own training, experience, and current professional practice. Some of the cross examination was effective in weakening the Department's position on the charges against the plaintiff. This was particularly true concerning the charge that the plaintiff improperly hired some of his patients to work in his clinic. The Board ultimately exonerated the plaintiff on this charge.
A serious flaw in the plaintiff's cross examination technique, at least in the view of the panel chairman, was his propensity for repetitiveness. In particular, Dr. Mandell, the chairman, repeatedly admonished the plaintiff to stop asking Dr. Selig whether he agreed that there are different schools of psychiatric theory concerning the appropriate method of handling the "transference phenomenon." It was this issue that eventually led the chairman to terminate the cross examination over the objections of both the plaintiff and the Department. The following excerpts from the transcript of the proceedings indicate the circumstances and something of the atmosphere surrounding the chairman's decision.
 DR. PET: Dr. Selig is representing that a particular modality using transference is one that I am required to be using in my therapy. And, my claim is that there are a number of therapies that are alternative that are held by reputable —
 CHAIRMAN MANDELL: Right. We know all that. You have been very persuasive in letting the panel know that that's correct. There are alternate therapies. Now, what is your question of Dr. Selig? We don't care whether he thinks this guy is an expert witness or what the statement was. Whether this was settled out of court. We only want to know what he thinks regarding the previous testimony he's given under Ms. Lederer's CT Page 5704 questioning and whether he thinks the statement of charges against you are true or false.
 DR. PET: Would you accept, Dr. Selig, that there are professionals in the field who —
 CHAIRMAN MANDELL. Don't ask him if he thinks there are differences of opinion among professionals in the field. We know that. If you ask it once more, I'm going to ask for legal counsel to tell me what I can do to stop that question being repeated. If it means a summary suspension of your license or if it means the hearing is called off or sent to a court. I don't know what I can do, but this panel understands there are differences of opinion among psychiatrists in forms of therapy just as there are in any discipline. And, we understand that Dr. Selig has given his viewpoint and that he understands there are other viewpoints. If that question's asked again, I'm going to adjourn this hearing and I'm going to go directly to the Attorney General's office and ask what I can do about you in that line of questioning.
 DR. PET: I'm trying to establish what I think is a very critical point and I'm also trying to understand the issue. I think this is the one expert witness that the Health Department presents, and I —
 CHAIRMAN MANDELL: We're going to take a ten minute break and you formulate a specific question of this witness and it cannot be on the differences of opinion amongst psychiatrists and are there alternate forms of therapy. Even Mr. Harris grasped that by now. All right. We are adjourned for ten minutes.
(A recess was taken.)
 CHAIRMAN MANDELL: I am instructed by higher ups in the Attorney General's office that we do not have to allow unlimited time for cross-examining of any witness. If we're getting into irrelevancies and repetition, that I have the authority as chairman of the panel to cut off cross-examination and with that in mind, I'm going to say now that this witness is going to be excused at 12:15 today.
 Also, I'd like from you now, a list of your next witnesses and when they're going to be available for your examination.
 MS. GAINES: Just for the record, I would note that it's ten after eleven, giving Dr. Pet a little over an hour for cross-examination.
CT Page 5705
 CHAIRMAN MANDELL: I've just explained that this witness is going to be excused at 12:15. Period. And, then I'm going to ask for a list of Dr. Pet's next witnesses and when they're going to be available.
 DR. PET: Dr. Mandell, I would like to take exception to the ruling that you're making.
CHAIRMAN MANDELL: I've just made it. Period.
DR. PET: I'd like to make —
 CHAIRMAN MANDELL: No. You've become repetitious. You got into irrelevancies. You're wanting our time. Your delaying tactics are untenable.
 DR. PET: I'd like to establish on the record why it is that I think —
 CHAIRMAN MANDELL: You've done that over and over again. Now, please, I want a list of your next witnesses. I'm told I don't have to allow you unlimited time. Now, who are your next witnesses and when are they going to be available?
* * *
 CHAIRMAN MANDELL: All right. Let's resume questioning and Dr. Selig is to be excused at 12:15. And, there will be no further testimony by Dr. Selig.
 DR. PET: Dr. Mandell, I do believe that I'm entitled to raise my objection. To time limits. I, I do have other areas to explore with Dr. Selig.
CHAIRMAN MANDELL: Then you better get started.
DR. PET: He is the only expert witness.
 CHAIRMAN MANDELL: Then, you'd better get started. I'm told that I do not have to give you limitless time and you're using up your valuable time right now.
 DR. PET: I will not have time to complete the questions that I have to ask of Dr. Selig and I would just like to establish that for the record.
Record, Vol. XV, pp. 66-71.
The cross examination then resumed. Following a short recess, Attorney Lederer, the counsel for the Department, who had CT Page 5706 called Dr. Selig as the Department's witness and who had conducted the direct examination, made the following statement:
 MS. LEDERER: Thank you. I would just like the record to reflect that my expert is available for the entire day. This was based not only on conversations we had in preparation, but also based on representations made at the last hearing. He has blocked out his schedule. He was anticipating returning this afternoon. As such, the Department would like to go on record as opposing the board's decision to close off Dr. Pet's cross-examination of this witness at a specified time. I would urge the panel to reconsider its ruling, allow the witness to return after a lunch break and allow Dr. Pet to proceed with questions that are within an appropriate scope of cross examination. Thank you.
To this, the panel's chairman replied:
 CHAIRMAN MANDELL: Thank you for those thoughts. We've been told by the Assistant Attorney General that we do not have to permit irrelevancies, repetition and we do not have to put up with contempt of this panel. This hearing, the witness will be excused at 12:15 . . . .
Record, Vol. XV, p. 83.
The plaintiff thereupon continued to cross examine the witness until the chairman cut him off, saying ". . . the time allotted for the end of the cross examination has come." Record, Vol. XV, p. 99. The chairman then invited the other panel members to question the witness, but they declined. He then permitted Attorney Lederer to question the witness on redirect examination and concluded the inquiry with questions of his own. The relevant portions of the transcript read as follows:
 MS. LEDERER: Dr. Mandell, I have one question on redirect that I feel the State is entitled to ask.
 CHAIRMAN MANDELL: You will be permitted one question on redirect.
BY MS. LEDERER:
 Q. Dr. Selig, upon your review of the respondent's records and notes on these patients as well as documents that were maintained in his files on these four women, what kind of therapy did he utilize in his treatment?
 A. I thought he utilized eclectic therapy which would include focusing on the transference.
CT Page 5707
Q. Thank you.
 A. And. I make that judgment based on his notes that stated. "discuss transference."
MS. LEDERER: I have no further questions.
 CHAIRMAN MANDELL: I have a question. Are you here as a good citizen or are you here under subpoena or are you being paid for your time or all of those things or —
 THE WITNESS: I'm being paid for my time at a very reduced rate. Do you want to know what it is?
 CHAIRMAN MANDELL: No. We didn't ask you to quantitate, but the State is paying you for your time and they did not subpoena you to be here. They asked you if you would come and testify and be their expert witness.
 THE WITNESS: Correct. But, the fact that it's at a reduced rate makes me want to answer affirmatively to your first choice which is as a good citizen.
 CHAIRMAN MANDELL: All right. We'll assume that you are doing this as a public service
Record, Vol. X, pp. 100-101.
Shortly thereafter, the chairman excused the witness. During this stage of the proceedings, the chairman also indicated to the plaintiff that he might be able to call Dr. Selig as his own witness during the presentation of his case in chief, saying ". . . you will have the right to get any witness here you want, I suppose, including Dr. Selig, if for some reason if (sic) you find that he's not . . . ." The Uniform Administrative Procedure Act, under which these proceedings were conducted, expressly provides that "a party may conduct cross examinations required for a full and true disclosure of the facts." General Statutes 4-178(3). Our appellate courts have consistently held that the "right of cross examination is not a privilege but is an absolute right . . ." Gordon v. Indusco Management Corporation, 164 Conn. 262, 272 (1973). In Dragan v. Connecticut Medical Examining Board, 24 Conn. 662
(1991), the court held that the right of cross examination is an indispensable right in a proceeding exactly the same as that under review in this case. There, the court held as follows:
 Cross-examination is an indispensable means of eliciting facts that may show motive, bias interest or prejudice . . . It "`is a substantial legal right which may not be abrogated or abridged CT Page 5708 at the discretion of the court . . .'" We recognize that proceedings before administrative agencies are not bound by strict rules of evidence and procedure but they cannot be conducted so as to violate fundamental rules of justice. . . Nor may the informalities that are permissible in an administrative hearing be permitted to prejudice the rights of the parties. If this should happen, the court is available to rectify the wrong . . . Moreover, the right of cross-examination is expressly provided for in contested hearings conducted by agencies subject to the UAPA . . . .
Id., p. 67. (Citations omitted).
Our courts have also underscored the importance of full, unfettered cross examination as a means of testing the credibility and qualifications of a witness. "Cross examination, in quest for the truth, provides a means for discrediting the testimony of a witness. `When pursued for that purpose, the examination frequently and legitimately enters into matters collateral to the main issues'. . . Matters which might not be strictly relevant on direct examination may be so on cross examination where that matter is explored for the purpose of credibility." State v. Ouellette,190 Conn. 84 (1983).
There are, of course, some limits on the "latitude and extent of cross examination" as to subject matter and time. State v. Saia,172 Conn. 37, 49 (1976). An administrative agency "shall, as a matter of policy, provide for the exclusion of irrelevant, immaterial or unduly repetitious evidence." General Statutes 4-178(1). The issue posed by these general principles in the context of the facts of this case is whether the chairman of the hearing panel was legally justified in terminating the plaintiff's cross examination of Dr. Selig when he did. Analysis of this issue requires the court to consider the significance of the witness and his testimony in the case, the nature and extent of the plaintiff's cross examination, and the circumstances under which the chairman ordered the cross examination terminated.
As previously indicated, Dr. Selig was the only witness called by the Department to provide expert opinion testimony in support of the charges it had brought against the plaintiff. These charges were generally that the plaintiff had been guilty of illegal, incompetent or negligent conduct in the practice of medicine in violation of General Statutes 20-13c. Among these charges, the Department alleged that the plaintiff improperly acted as both therapist and employer of his patients; that he mismanaged the "transference phenomenon" in the course of treating certain patients; and that he negligently prescribed and monitored the use of medication by certain of his patients. Quite clearly, these charges involve questions beyond the knowledge and experience CT Page 5709 of members of a fact finding panel who have not received special education, training or experience in those fields. Expert testimony would, therefore, be required to prove such charges in the absence of any specialized knowledge on the part of the panel. Franchey v. Hannes, 155 Conn. 663, 666 (1967). In administrative proceedings such as this, agency members hearing a case may rely on their own expertise within the area of their professional competence, but expert testimony may be required when the question goes beyond their knowledge and experience. Levinson v. Board of Chiropractic Examiners, 211 Conn. 508, 522-533
(1989); Feinson v. Conservation Commission, 18 Conn. 421, 428
(1980).
In the present case, a majority of the panel and of the Board were physicians, and, therefore, the Board was entitled to rely on the expertise of those members with respect to questions concerning the plaintiff's professional conduct. Jaffe v. Department of Health, 135 Conn. 339, 349 (1949). On the other hand, the defendants have pointed to no evidence in the record concerning the agency members' expertise in the precise subject matter of the charges brought against the plaintiff. In their Motion for Protective Order and in the Board's objection to the plaintiff's interrogatories, both filed in connection with discovery requests of the plaintiff during this appeal, the defendants vigorously and successfully opposed the plaintiff's attempt to inquire into the members' particular expertise in the subject matter of the charges. The court infers, however, that the Department considered expert testimony on this subject matter to be important evidence, since it was the Department which produced the witness. Furthermore, the Board specifically referred to Dr. Selig's testimony as support for its finding that the plaintiff was negligent in monitoring a patient's use of medication. This, in turn, was one of the bases for the suspension of the plaintiff's license. For all of these reasons, the court concludes that the Department considered Dr. Selig to be a highly significant witness in its case against the plaintiff and that the Board based its decision, in part, on his testimony.
The transcript of the plaintiff's cross examination of Dr. Selig does not reveal the amount of time he was actually allotted before the chairman cut him off. It was more than three hours, but less than five hours, in all, spread over two sessions of the hearing. It appears from the record that the direct examination consumed less than two hours. As indicated previously, the cross examination covered all of the matters raised on direct examination, and it also dwelt heavily on the witness's qualifications and credibility. In particular, the plaintiff questioned the witness closely on his expertise in the practice of behavioral therapy, which was the field in which the plaintiff asserted he specialized, and how such therapy dealt with the "transference phenomenon." Indeed, at the point when the chairman ordered the cross examination terminated, CT Page 5710 the plaintiff had just succeeded in getting Dr. Selig to concede that he was not an expert in that field. The point the plaintiff was obviously attempting to establish was that Dr. Selig should not be allowed to give an expert opinion concerning the plaintiff's method of treatment. This arguably might have influenced the Board to reach a different decision on the "transference phenomenon" issue.
The circumstances under which the chairman terminated the cross examination are clearly revealed by the excerpts from the transcript of the hearing set forth above. They may be summarized as follows:
 1. The ultimate limitation on the plaintiff's cross examination was a time limitation. Although the chairman referred to the plaintiff's repetitious questions concerning different schools of psychotherapy and ruled that no more of such questions could be asked, he took the further step of placing an ultimate limit on the length of the cross examination rather than on its content. Furthermore, the chairman's ruling was made in the course of delivering a strong rebuke to the plaintiff for his pursuing the prohibited line of questioning. Under these circumstances, the court concludes that the chairman's ruling was punitive in purpose rather than merely limiting redundant cross examination.
 2. The chairman terminated the cross examination while the plaintiff was questioning the witness's qualifications and credibility, which are always legitimate subjects for cross examination.
 3. The manner in which the plaintiff's cross examination of Dr. Selig was terminated and the surrounding circumstances effectively prevented the plaintiff from re-cross examining the witness after the Department had the opportunity of re-direct examination. Although there was no specific ruling to that effect, the hostile atmosphere created by the chairman clearly discouraged the plaintiff, acting pro se, from even requesting the opportunity. The plaintiff was also prevented in the same way from re-cross examining Dr. Selig after the chairman himself questioned him concerning his "good citizen" motivation and the reduced fee he was charging the Department for his services as its witness. This was an entirely new subject area which would ordinarily invite legitimate, vigorous cross examination.
 4. The plaintiff's opportunity to question Dr. Selig was, in effect, permanently terminated. Although the chairman stated, somewhat obliquely, that the plaintiff might be able to call Dr. Selig as his own witness at a later date, the court concludes CT Page 5711 that this did not amount to an adequate, realistic substitute for allowing him to continue cross examination while the doctor was then present at the hearing. First, there is nothing in the chairman's statement which suggests that the plaintiff would be permitted to continue the cross examination if and when he called Dr. Selig as his own witness. Indeed, given the chairman's clearly expressed attitude, that seems unlikely. Furthermore, the Appellate Court has held that requiring a party to subpoena an opponent's witness in order to exercise a right of cross examination "would render the right meaningless." Dragan v. Medical Examining Board, supra, p. 668.
 5. The chairman terminated the plaintiff's right of cross-examination not only over the objection of the plaintiff, but also over the express objection of his opponent, the complainant Department. In making the objection, the Department's counsel indicated that the witness had made the time available for continued cross examination, and the attorney urged the chairman to permit the plaintiff to continue.
General Statutes 4-183(j) (Rev'd 1989), which applies to this case, provides in relevant part, as follows:
 . . . . The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions . . . (3) made upon unlawful procedure; (4) affected by other error of law . . . or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may . . . remand the case for further proceedings . . . .
Fundamental principles of our law, as set forth above, support the complete, unfettered right to cross examine opposing witnesses in administrative agency proceedings such as the one here under review. The corollary to this rule is that the law strongly disfavors restrictions on that right.
The facts of this case, as appearing in the record, do not afford a reasonable basis for the imposition of the arbitrary time limitation on the plaintiff's right to cross examine Dr. Selig. Rather, the chairman of the panel could have simply continued to prohibit questions found to be repetitious. This would have achieved his purpose without destroying the plaintiff's legal right.
The termination of the cross-examination prevented the plaintiff from fully testing the credibility and qualifications of the opposing expert witness. Furthermore, it prevented the plaintiff CT Page 5712 from conducting reasonable re-cross examination after the Department's re-direct examination. Most significantly, the plaintiff was prevented from cross examining the witness concerning his motives in testifying, including any possible bias or prejudice, after he had testified in response to friendly, leading questions by the chairman of the panel.
The chairman's sua sponte decision, exercised over the objection of even the plaintiff's opponent, for punitive reasons, could only be justified in the most extreme circumstances of misconduct or contemptuous behavior by the plaintiff. There is no evidence in the record that such misconduct occurred in this case.
Based on the foregoing considerations, the court concludes that the Board, acting through the chairman of the hearing panel, violated the plaintiff's legal right to cross examine fully and adequately an important opposing witness. The Board's action was arbitrary and constituted an abuse of its discretion. In so acting, the Board prejudiced a substantial fundamental right of the plaintiff.
The court's conclusions concerning the cross examination issue require that the Board conduct a new hearing on the charges against the plaintiff. The court is well aware that, from many viewpoints, this will be seen as a most unsatisfactory result. Inasmuch as the case began in 1986, some may see this result as the worst example of the law's delay, mired in an unnecessary procedural quagmire.
Others may question the necessity for a new hearing if, as the court has found, there was substantial evidence in the record of this hearing to support the Board's decision concerning serious violations of the state's medical standards law. Finally, the court is aware of the hardship, expense, and emotional cost that will be inevitably incurred by many witnesses and other participants in a new hearing on these difficult, serious charges.
The answer to these and other legitimate concerns is that our system of justice demands above all else that governmental proceedings involving people's fundamental rights be conducted in accordance with basic principles of fairness. Governmental proceedings which fail that test must be nullified. There is no question that the plaintiff's right to practice medicine, which is at stake in this case, is a fundamental property right of which he cannot be deprived without due process of law. Pet v. Medical Examining Board, supra. The court has already observed that the procedure which was followed under the Uniform Administrative Procedure Act, although meeting minimum constitutional standards, was not well suited for the determination of facts by the administrative agency in this particular case. This law permits an inordinately long, discontinuous fact finding process, as did CT Page 5713 occur in this case. It permits decisions on subtle factual issues, such as witness credibility, where personal observation is usually thought to be essential, to be made instead by agency members who have never seen the witnesses. Such "remote control" decision making did occur in this case. This law limits the amount of pre-hearing evidence gathering that is normally allowed by the discovery process in other civil cases. Some limitation on discovery did occur in this case. In short, the statutory procedure which was employed in this case actually discouraged the most effective fact finding, apparently in favor of administrative efficiency and in deference to the personal schedules of the panel members. See Pet v. Department of Health Services, supra. In such a setting, where the issues at stake are so vital to the lives and fortunes of the people involved, it is absolutely imperative that basic, fundamental rules of procedural fairness, such as the right to cross examine opposing witnesses, be retained and scrupulously protected.
In accordance with General Statutes 4-183 and based on the court's conclusions set forth above, the court sustains the plaintiff's appeal. Under the circumstances of this case, the law requires that the case be remanded to the Board for a new hearing. Dragon v. Medical Examining Board, supra, pp. 668-669.